IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ANGELIA D. BAKER, o/b/o J.D.B.,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| v. | ) | **CV-07-KOB-1218-NE** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Claimant Angelia D. Baker filed an application for supplemental security income (SSI) on behalf of minor child J.D.B. on July 2, 2004. The Commissioner denied the claims. The claimant then requested and received a hearing before an Administrative Law Judge. The ALJ held a hearing on February 14, 2006. In a decision dated September 16, 2006, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for SSI payments. The claimant then applied to the Appeals Council for review.  On May 25, 2007, the Appeals Council denied the claimant's request for review. This denial constituted the final decision of the Commissioner of Social Security and the exhaustion of the claimant's administrative remedies. The case is now before the court for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Based on the court's review of the record in the case and the parties' briefs, the court will REVERSE and REMAND the decision of the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g).

1

**ISSUES PRESENTED**

The claimant presents the following issues for review: whether the ALJ committed reversible error in failing to properly evaluate whether J.D.B.'s impairments are functionally equivalent to a listed impairment; whether the ALJ erred in not finding that J.D.B. has an impairment or combination of impairments that meet or medically equal the listed impairments; or, alternatively, whether the case should be remanded with instructions to obtain medical expert testimony regarding whether J.D.B.'s impairments meet or medically equal a listed impairment.

**STANDARD OF REVIEW**

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record which support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## LEGAL STANDARDS

"A claimant under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations provide a three-step sequential analysis to determine whether a child is disabled. *See* 20 C.F.R. § 416.924(a). The first question is whether the claimant is engaged in substantial gainful employment; if so, the claimant is not disabled.

If the claimant is not engaged in substantial gainful employment, the second question is whether the claimant has a severe impairment. For an individual who has not attained the age of 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. If the claimant does not have a severe impairment, the claimant is not disabled.

If the claimant does have a severe impairment, the third question is whether the impairment meets or equals those contained in the Listing of Impairments found in 20 C.F.R. § 404.1520(e). If so, the child is conclusively disabled. If not, the child is not disabled. *Id.*; *see also Wilson v. Apfel*, 179 F.3d 1276, 1278 n.1 (11th Cir. 1999). In determining whether an impairment or combination of impairments functionally equals the Listings, the adjudicator must assess the claimant's functioning in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). In making this

assessment, the adjudicator must compare how appropriately, effectively, and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments. To functionally equal the Listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

In assessing whether the claimant has "marked" or "extreme" limitations, the adjudicator must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. 20 C.F.R. § 416.926a(a). The adjudicator must consider the interactive and cumulative effects of the claimant's impairment or combination of impairments individually in each domain. 20 C.F.R. § 416.926a(c).

A child has a "marked" limitation in a domain when his impairment(s) "seriously interfere" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is "more than moderate" and "less than extreme;" the equivalent of functioning that would be expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean; a valid score that is two standard deviations, but less than three standard deviations, below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain and a day-to-day functioning in domain-related activities consistent with that score; for the domain of health and well-being, episodes of illness or exacerbations that result in significant, documented symptoms or signs that occur three times a year and lasting two weeks or more, more often than three times a year but lasting less than two weeks, or less often than three times a year but lasting longer than two weeks if the overall effect is equivalent in severity.

A child has an "extreme" limitation in a domain when his impairment(s) "very seriously interfere" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). An "extreme" limitation is "more than marked;" the equivalent of functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean; a valid score that is three standard deviations below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain and a day-to-day functioning in domain-related activities consistent with that score; for the domain of health and well-being, episodes of illness or exacerbations that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation

### BACKGROUND

J.D.B. was twelve years and nine months old at the time of the administrative hearing. (R. 17). At the time of the hearing, J.D.B. was a sixth grade student at Monrovia Middle School in Madison, Alabama. (R. 372). He was in a special, Individual Education Program at Monrovia Middle School. (R. 372). According to the claimant, J.D.B. became disabled on July 2, 2004,[1] due to a learning disability and depression. (R. 43, 47).

J.D.B.'s mother alleges that J.D.B. has no problems seeing, hearing, talking, engaging in physical activities, or taking care of his personal needs. (R. 82-91). However, she claims that J.D.B. has difficulty communicating phone messages clearly or telling jokes or riddles accurately (R. 85); has limited ability to read and understand simple sentences, books, or magazines (R. 86); has difficulty writing in long hand, knowing the days and months, and telling time (R. 86); has difficulty

---

[1] Originally, the claimant alleged an onset date of March 10, 2003, but later amended the onset date to July 2, 2004, the date the SSI benefits application was filed.

making new friends and getting along with her and other adults (R. 88, 382); and has difficulty paying attention and sticking with a task (R. 90, 387-88).

J.D.B. has participated in the Individualized Education Program (IEP) at his school since the third grade, November 2002. (R. 145, 372). His accommodations included direct instruction in a special education classroom, shortened classroom work and tests, and special instruction in reading, writing, and math. (R. 145-52). In April 2003, J.D.B. took the Stanford Achievement Test (SAT) and scored at 2% in Total Reading, 3% in Total Math, 1% in Language, Science, and Social Studies. (R. 115). The national average is 50%. In April 2003, J.D.B. was also reevaluated to determine if changes needed to be made to his IEP. (R. 132-35). At that point, he was noted as exhibiting receptive and expressive language deficits and phonemic awareness deficits significant enough to warrant special speech and language therapy in addition to his other IEP services. (R. 132-35).

At the beginning of his fourth grade year, in August 2003, J.D.B. took a Standard Testing and Reporting (STAR) reading test to evaluate his general reading skills. (R. 129). His STAR scores indicated that he could read at a level comparable to the average Kindergartener after nine months of school. In January 2004, his STAR scores dropped to a level comparable to the average Kindergartener after only five months of school. (R. 112). His fourth grade Woodcock Johnson III evaluation indicated that he performed at grade equivalent levels of 1.1 for letter-word identification, 1.0 for passage comprehension, 1.5 for spelling, 1.6 for writing, 2.6 for calculation, and 2.3 for applied problems. (R. 117). He was promoted to the fifth grade with a recommendation for continuing accommodations under his IEP.

In June 2004, J.D.B. underwent psychiatric evaluation at Huntsville Hospital after yelling at his mother at her place of employment and shutting himself in the employer's bathroom. (R. 240-48).

Also in June 2004, Dr. Aparna Vuppala, with Trinity Counseling Center, evaluated J.D.B. at the referral of J.D.B.'s pediatrician, Dr. Susan Markel, with The Rainbow Pediatrics. (R. 249-53). Based on Dr. Vuppala's evaluation, she diagnosed J.D.B. with a moderate Major Depressive Disorder and recommended a trial dosage of Zoloft and individual and family psycotherapy.

In October 2004, Dr. Belvia Matthews, with Psychological & Counseling Associates, evaluated J.D.B.'s intellectual functioning and conducted a neurological (Dyslexia) screening, as requested by J.D.B.'s mother and attorney. (R. 263-69). Dr. Matthews noted that J.D.B. had been irritable ever since his father was incarcerated in November 2003, and that J.D.B.'s mother reported he had anger control issues at home and at school. After administering the Wechsler Intelligence Scale for Children – Third Edition (WISC-III), Dr. Matthews concluded that J.D.B. was intellectually deficient in verbal skills, borderline in performance, and intellectually deficient on the full scale overall. The difference in J.D.B.'s verbal and non-verbal reasoning skills led Dr. Matthews to determine further psychological assessment was warranted. Dr. Matthews also concluded, based on a screening form filled out by J.D.B.'s mother, that J.D.B. exhibited significant symptoms frequently associated with Dyslexia, which would require further neurological assessment.

In November 2005, J.D.B.'s education curriculum was continued for his sixth grade year under his IEP. (R. 177-91). The student profile indicated that J.D.B. was a quiet child with a few friends, progressively more anxious, attempting very little work, and exhibiting slight aggressive behavior. The profile also indicated that J.D.B. struggled the most with reading and writing, but that he had improved in math, especially in addition and subtraction. His IEP included speech therapy, modified homework assignments, more time for tests and homework assignments, and special assistance with some in-class assignments.

In January 2006, Dr. JoAnn Johnson, with The Rainbow Pediatrics, saw J.D.B. for his complaints of sleep disturbance. (R. 273-74). Dr. Johnson noted that J.D.B. was depressed about his father's incarceration and complained about not sleeping well. Dr. Johnson prescribed Adderall and Clonidene. In February 2006, Dr. Johnson saw J.D.B. to follow up on his prescriptions. At that time, Dr. Johnson continued J.D.B. on both Adderall and Clonidene.

In November and December 2006 and February 2007, J.D.B.'s seventh grade IEP was amended to add a Behavior Intervention Plan due to behavioral problems. (R. 312-19). J.D.B.'s behavioral problems included in-school suspension for talking back when reprimanded and shoving another student in the lunchroom in August 2006; a three-day suspension for physically grabbing another student, putting him in a headlock, and biting him, breaking the skin, in September 2006; in-school suspension for striking a female student on her buttocks in September 2006; suspension from riding the bus for being disrespectful to the bus driver and fighting in October 2006; in-school suspension for throwing his books against the wall in the gym lobby and throwing a large garbage can in November 2006; a five-day suspension for threatening and cussing at a teacher in December 2006; and a three-day suspension for throwing his notebooks across the classroom in February 2007. (R. 297-98). As a result of his behavioral problems, J.D.B. was also placed in alternative school for two terms of 20 days each.

On April 4, 2007, Dr. Bridget Floyd, with the Mental Health Center of Madison County, evaluated J.D.B. (R. 362). Dr. Floyd noted that J.D.B.'s behavior was inconsistent with his age level and suggested cognitive and/or comprehension problems. Dr. Floyd prescribed Abilify and scheduled a follow-up appointment two weeks later. On April 18, 2007, J.D.B. visited Dr. Floyd for his follow-up, and Dr. Floyd noted that J.D.B.'s moods had improved and that his insights into anger

management strategies were good. (R. 363). Dr. Floyd suggested that J.D.B. continue on Abilify and scheduled a second follow-up appointment two weeks later. On May 1, 2007, J.D.B. visited Dr. Floyd again. (R. 366). Dr. Floyd noted that J.D.B. had effectively implemented positive anger management techniques, such as involving a teacher when other students would pick on him instead of fighting. Dr. Floyd also noted that J.D.B. expressed a desire to earn more trust and responsibility so that his mother and siblings would give him more independence. Dr. Floyd also noted that J.D.B.'s moods had improved, that his anger management strategies were improving, and that his sleep appeared to have improved.

J.D.B.'s eighth grade IEP indicated that he rarely volunteered in class and struggled with communication skills and maturity. (R. 327). Under his eighth grade IEP, J.D.B. received in-class accommodations and assistance in math, literature, and English. His speech and language therapy sessions also continued for his eighth grade year. J.D.B.'s Behavioral Intervention Plan including allowing him to remove himself from potentially volatile situations and to go to a "cooling off area." (R. 336).

On September 16, 2006, the date of the ALJ's decision, the claimant was 13 years of age. (R. 17, 26). After considering the entire record, the ALJ found that the claimant suffered the severe impairments of depression, a learning disorder, attention deficit disorder, and oppositional defiant disorder (R. 17). The ALJ, however, found that the claimant's impairments, independently or in combination, were not severe enough to qualify under the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18, 20). Accordingly, the ALJ concluded that the claimant was not disabled. (R. 26).

# DISCUSSION

**I.    The ALJ committed reversible error in failing to properly evaluate whether J.D.B.'s impairments are functionally equivalent to a listed impairment.**

The claimant argues that the ALJ erred in failing to consider J.D.B.'s standardized testing results as objective evidence of "extreme" limitations in the domain of acquiring and using information. Pursuant to 20 C.F.R. § 416.926a, the SSA is required to consider such formal testing in evaluating a claimant's function. *Borgens v. Halter*, 164 F. Supp. 2d 1309, 1311 (M.D. Fla. 2001). Though test scores alone cannot establish disability, test scores must be considered or the ALJ must explain the reasons why the test scores were not relied upon. 20 C.F.R. § 416.926a(e)(4).

Despite the importance of standardized test scores, such as the Woodcock Johnson tests and the SATs, the ALJ references only two tests in his decision – the Test of Nonverbal Intelligence, 3rd Edition (TONI-III) of December 2002, and the WISC-III of October 2004. The court notes that the TONI-III is a language-free, motor-reduced and culture-reduced test of an individual's problem solving and abstract reasoning abilities. The nature of the TONI-III makes it a somewhat incomplete test of a person's ability to acquire and use information. Even so, the results of the TONI-III indicated that J.D.B. was below average for intellectual functioning. Additionally, the WISC-III results indicated a Verbal IQ of 56, a Performance IQ of 78, and a Full Scale IC of 64. As a result of those scores, Dr. Matthews, a doctor with Psychological & Counseling Associates who evaluated J.D.B. in October 2004, diagnosed J.D.B. with cognitive functioning in the extremely low category. The ALJ discredited the IQ scores, which are within the Listing of Impairments, because Dr. Matthews diagnosed J.D.B. with a learning disorder, not retardation.

The ALJ wholly failed to address and properly consider the other test scores in the record,

including the Woodcock Johnson tests, the STAR, and the SATs. J.D.B.'s scores on these standardized tests consistently placed him well below the national average for his age and well below the appropriate level for his grade. The ALJ failed to mention these standardized tests, failed to determine their significance (i.e., the number of standard deviations), and failed to explain what if any weight was given to such test results and the reasons for such valuation. The court, therefore, concludes that the ALJ's decision that the claimant's impairments only constitute "marked" limitations in the domain of acquiring and using information was not supported by substantial evidence. As a result, remand of this case for further development of the record is warranted. *See Borgens*, 164 F. Supp. 2d at 1312-13.

  **II.** **The ALJ erred in not properly considering evidence of the claimant's IQ scores in determining whether the claimant meets or medically equals Listing 12.05.**

  The claimant argues that substantial evidence does not support the ALJ's determination that the claimant does not meet or equal the Listings found in 12.05. Listing 12.05(B) requires a "verbal, performance, or full scale IQ [score] of 59 or less" to qualify as a disabling impairment. Here, the claimant has a Verbal IQ of 56, which clearly falls within the requirements of Listing 12.05(B). The ALJ himself found that J.D.B.'s IQ scores fell within the range listed in 12.05; however, the ALJ determined that the claimant had not met the Listing because his doctors had not diagnosed him with mental retardation. A plain reading of Listing 12.05(B) reveals that it does not require a diagnosis of mental retardation. The Listing simply requires a valid IQ score of 59 or less. The ALJ's decision, therefore, constitutes reversible error.

  The Commissioner asserts in his brief that other records indicate that the claimant took more than one valid IQ test, some of which may indicate that J.D.B. has an IQ in the 80s, and that the

11

ALJ's decision to discount the WISC-III Verbal IQ of 56 was warranted. However, the court notes that the ALJ failed to mention any of these other potentially valid IQ scores in making his determination. While the court concedes that the ALJ would have committed no error in considering "multiple IQ scores generated by different test administrations," the court concludes that the ALJ's failure to mention the other IQ scores upon which he relied instead of the WISC-III score constitutes reversible error. The court concludes that the ALJ's decision that the claimant does not meet the criteria for one of the subsections of Listing 12.05 was not supported by substantial evidence.[2]

## CONCLUSION

For the reasons stated above, the court concludes that the ALJ failed to properly evaluate whether the claimant's impairments are functionally equivalent to a listed impairment and failed to support with substantial evidence his conclusion that the claimant does not meet Listing 12.05. The court, therefore, concludes that the Commissioner's decision is due to be REVERSED and REMANDED for further review to determine whether the claimant is entitled to SSI benefits. A separate order to that effect will be entered simultaneously.

DONE and ORDERED this 31st day of March, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[2] Because the court is remanding the cause for further review on the first two issues, the court need not reach the claimant's alternative argument on appeal.